# United States Court of Appeals

## For the First Circuit

No. 02-1064

POLAND SPRING CORPORATION,

Plaintiff, Appellee,

v.

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,
AFL-CIO-CLC, LOCAL 1445,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Lynch, Circuit Judges.

Warren H. Pyle, with whom Lara Sutherlin and Pyle, Rome,
Lichten & Ehrenberg, P.C., were on brief, for appellant.
Richard R. Boisseau, with whom Amy R. Walker and Kilpatrick
Stockton LLP, were on brief, for appellee.

December 24, 2002

**TORRUELLA**, <u>**Circuit Judge**</u>.  The appellant, United Food and Commercial Workers International Union AFL-CIO-CLC, Local 1445 ("Union") appeals from the district court's summary judgment vacating an arbitration award that reinstated employee Leo Beaupre and reduced his discharge to a suspension without pay.  Appellee is the Poland Spring Corporation ("Poland Spring"), which terminated Beaupre for insubordinate behavior on February 5, 2000.  We affirm.

## Background Facts

Poland Spring is a bottler of non-carbonated water with bottling facilities in Maine.  In 2000, Leo Beaupre worked for Poland Spring as a palletizer operator.  A palletizer is a machine that loads cases of bottles onto pallets and wraps the full pallets in plastic for shipping.  As a palletizer operator, Beaupre was responsible for placing empty pallets on the machine, removing loaded pallets, and keeping the area around his machine clean.  Since his palletizer was elevated on legs above the floor, this housekeeping task occasionally required him to remove stray bottles from under the machine.

The incident which led to Beaupre's termination occurred on the night shift beginning on February 5, 2000. Beaupre's supervisor that night was Mike Arsenault, a former co-worker of Beaupre's who had recently been promoted to a supervisory role.  At some point during the shift, a group of employees got together and began playfully teasing Arsenault.  This group included Beaupre.

The employees teased Arsenault rather crudely about his recent promotion, stating in starkly graphic terms how he was promoted for providing an imaginative variety of sexual favors to the plant manager, another male.

Arsenault did not appear offended at first. In fact, at some point Arsenault actually joined in the ribbing, pretending to call up the plant manager on his radio to tell the manager that he would be right up to see him. Predictably, this spirit of jocularity did not last. According to Arsenault, the joking ended when the group received a radio call, and Arsenault assigned the employees to various work tasks. Beaupre, in contrast, testified that Arsenault suddenly "became unglued," stated "[t]hat will be enough," and ordered everyone back to work.

When the banter ended, Arsenault directed Beaupre and another worker to go into the filler room and help clean up stray bottles that were on the floor. Beaupre explained to Arsenault that due to an asthmatic condition, he could not work in the filler room where elevated levels of ozone could be present. Arsenault responded that if Beaupre could not work in the filler room, he should go clean bottles out from underneath the accumulation table. The accumulation table is a large table where filled bottles coming from the filler operation can accumulate if the palletizer operation is interrupted. The task would require Beaupre to crawl

-3-

under the accumulation table, which stands on legs only a few feet off the floor.

Beaupre refused to follow this directive from Arsenault, telling Arsenault that his "crawling days [were] over; it's hard for me to crawl into bed [and] hard for me to crawl out of bed." Arsenault then repeated his directive to Beaupre, but Beaupre continued to refuse to clean out the bottles. According to Arsenault, he then warned Beaupre that his non-compliance would constitute an act of insubordination which could result in Beaupre's termination. Nevertheless, Beaupre again refused to comply with the order.

Arsenault then directed Beaupre to accompany him to a conference room. On the way there Beaupre asked Arsenault whether he was really going to fire Beaupre over a bottle of water, and also asked Arsenault whether that would make him feel like a man. Despite the fact that Arsenault had now made it clear to Beaupre that he could face termination for failure to comply with Arsenault's directives, he refused to clean up the bottles.

While they were walking toward the conference room, Arsenault radioed a more experienced supervisor to join them. Also joining them were two other plant employees who came at Arsenault's request as witnesses. Once again, the supervisors instructed Beaupre to go pick up the bottles as directed, and once again

Beaupre refused to perform the assigned work. Beaupre was suspended pending investigation, and sent home.

The following day, the Union filed a grievance, alleging that Arsenault's fraternizing and joking with the plant employees was unprofessional, and that after being the subject of so much teasing, Arsenault retaliated by trying "to embarrass [Beaupre] in front of his peers by making him crawl under a conveyer for one bottle[.]"

At a post-suspension "Step 2" hearing, Beaupre and the Union offered two affirmative defenses explaining Beaupre's refusal to obey a directive. The Union's arguments were rejected, and following the Step 2 grievance meeting, Poland Spring converted Beaupre's suspension to a termination of employment.

### The Collective Bargaining Agreement

The Union submitted a grievance pursuant to the collective bargaining agreement then in existence between it and Poland Spring. Article 32 of the agreement is entitled "Discipline and Discharge" and provides in plain language that insubordination "shall" constitute just cause for termination. That Article also provides that a number of offenses may warrant a lower level of discipline prior to discharge. Insubordination, however, is not such an offense. The relevant section of Article 32 provides:

> Discipline and discharge shall only occur for just cause. The parties agree that just cause for discharge shall include, but not be limited to, the following:

-5-

. . .
          8. Insubordination
. . .

Under Article 33, the arbitrator's authority is expressly limited to the provisions of the Agreement. Accordingly "[t]he arbitrator shall have no power to alter or modify any of the terms of this Agreement or to impose on any party a limitation or obligation not explicitly provided for in this Agreement."

## **The Arbitrator's Award**

The factual findings of the arbitrator are substantially those previously discussed. Nevertheless, because the primary issue for our consideration is whether the arbitrator unambiguously found that Beaupre's February 5 conduct was insubordinate, it is helpful here to reproduce substantial portions of the arbitrator's decision.

His discussion of the termination began:

> There is little doubt in this case that absent some persuasive affirmative defense, [Beaupre] was guilty of the offense of insubordination on the February 5, 2000 night shift. Arsenault repeatedly ordered the grievant to clean out the scrap bottle(s) from under the accumulation table. The grievant repeatedly refused to comply with that directive, even after first Arsenault and then [another supervisor] made it clear to him that he could be terminated for so refusing.

The arbitrator then evaluated the two affirmative defenses raised by the Union. First, the Union argued that Beaupre's repeated refusals to follow his supervisor's order were

motivated by a sincerely held concern for his health. The arbitrator determined that this argument was not credible and that Beaupre's health was not the reason he refused to clean up the bottles. The Union alternatively argued that because the order to clean up the bottles followed so closely upon the sexual banter between Arsenault and the plant workers, Beaupre believed he might have been subjected to undue humiliation or embarrassment, or even risk of sexual assault. The arbitrator determined that this defense was entirely unpersuasive and that any apprehensions Beaupre might have had were not reasonable.

Since the arbitrator began his discussion by stating that "absent some persuasive affirmative defense [Beaupre] was guilty of the offense of insubordination," one might have expected the arbitrator to conclude his analysis after rejecting both affirmative defenses proffered by the Union. Instead, the arbitrator stated that there was "one remaining issue for discussion, that being the level of discipline imposed." After thus declaring that he was now exploring remedial possibilities the arbitrator broke down the term "insubordination" into two types: straightforward insubordination, and insubordination in the presence of mitigating circumstances. The arbitrator reasoned:

> [Article 32] may well establish that in clear, straight-forward cases of insubordination, without mitigating considerations, the parties by agreement have established the per se rule that there is just cause for termination. However, the language

-7-

of Article 32 does not state that even in the presence of mitigating circumstances, insubordination still will necessarily provide the company with just cause for termination. On the contrary, where significant mitigating considerations are present, the culpability of the employee may be diminished, and summary termination may no longer be justified. This more complex fact situation must be considered under the general, just cause standard set forth in article 32, giving due weight to the fact that the parties have agreed that a pure case of insubordination, without mitigating considerations, would provide just cause to terminate.

Having distinguished straightforward insubordination from insubordination with mitigating circumstances, the arbitrator placed Beaupre's claim in the latter category. The arbitrator found that Beaupre's refusal to comply with his supervisor's directive was mitigated by his supervisor's misconduct, which "blurred the line between the supervisor and the workers." According to the arbitrator, once the supervisor joined in the ribbing and sexual banter, his "improper fraternizing with the workers created an environment where one of the employees might think, at least initially, that Arsenault was not acting in his supervisory capacity, but rather only as one of the guys joking around on the shop floor." The arbitrator concluded that "it was unjust for the Company to terminate the grievant for his insubordinate behavior which immediately followed." Nevertheless, despite the presence of mitigating circumstances, the arbitrator concluded that Beaupre's protracted refusal to comply with the

directive still constituted "insubordinate behavior."  The arbitrator determined that:

> [Beaupre] should have been able to figure out that Arsenault had shifted gears and was now acting in his supervisory capacity; he should have promptly followed the directives of the person he knew to be his supervisor. Furthermore . . . Arsenault first alone and then with the assistance of [another supervisor] gave the grievant clear warning of the fact that his behavior had become insubordinate, and gave the grievant numerous opportunities over an extended period of time to abandon his initial refusal, and to perform the work as directed.

Ultimately the arbitrator concluded that while mitigating circumstances rendered the company's decision to terminate Beaupre unjust, Beaupre's insubordinate behavior over an extended period of time warranted a two week suspension without pay.

## Summary Judgment

Poland Spring filed suit in district court to vacate the arbitration award.  The court granted summary judgment, finding that the award exceeded the arbitrator's authority under the Agreement.  The court held that in the Agreement there is "nothing about 'clear, straight-forward' cases, 'pure' cases, or 'mitigating circumstances.'"  The court found that under the circumstances, the arbitrator lacked the authority under Article 32 to reinstate an insubordinate employee.  The Union appealed.

## Discussion

-9-

Judicial review of an arbitrator's decision is extremely narrow and deferential. United Paperworks Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987); Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8, 10 (1st Cir. 2001). We do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of an award. Misco, Inc., 484 U.S. at 36-37. We cannot vacate the award because the arbitrator misreads the contract, where there is room to do so. Id. at 37-38. Nor are we authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him the authority to decide that question. Id. at 38. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Id.

Nevertheless, acknowledging that our role is a limited one is not the equivalent of granting limitless power to the arbitrator. Georgia Pacific Co. v. Local 27, United Paperworkers Int'l Union, 864 F.2d 940, 944 (1st Cir. 1988). The decision to settle labor-management disputes through arbitration is a wholly voluntary decision by private parties, grounded on their will as expressed in the collective bargaining agreement. Id. "Therefore, the paramount point to be remembered in labor arbitration is that the power and authority of an arbitrator is totally derived from the collective bargaining agreement and that he violates his

-10-

obligation to the parties if he substitutes 'his own brand of industrial justice' for what has been agreed to by the parties in that contract."  Id. (quoting United Steelworkers v. Enterprise Wheel & Car, 363 U.S. 593, 597 (1960); see also Misco Inc., 484 U.S. at 38.  If the language of an agreement is clear and unequivocal, an arbitrator cannot give it a meaning other than that expressed by the agreement.  Georgia-Pacific Co., 864 F.2d at 944.

In support of the arbitration award, the Union contends that the arbitrator did not unambiguously find Beaupre guilty of insubordination as that term is used in Article 32.  Instead, it claims, the arbitrator found that because Beaupre's actions were mitigated by the horseplay of his supervisor, Beaupre's conduct should not be treated as insubordination per se, but should rather be evaluated under the general, "just cause" standard also set forth in Article 32.  That is, since Beaupre's culpability was lessened by his supervisor's own misconduct, the arbitrator properly considered Beaupre's misconduct under the flexible "just cause" provision of Article 32, rather than the "insubordination" standard of that same section.

We disagree with the Union's selective reading of the arbitration award.  The award unambiguously concluded that Beaupre's misconduct on the night of February 5, 2000 constituted insubordination pursuant to Article 32 of the Agreement.  The arbitrator unequivocally found: first, that a clear order was

-11-

repeatedly given to Beaupre; second, that Beaupre fully understood the consequences of failure to comply with the order and yet repeatedly refused to do so; and finally, the arbitrator concluded that Beaupre's refusals to comply with the order constituted acts of insubordination subject to discipline under Article 32 of the agreement.

First, it is beyond dispute that the arbitrator found that Beaupre repeatedly refused to comply with his supervisor's directives. He concluded that "the grievant declined to follow this directive from Arsenault. Arsenault repeated his directive to the grievant, but the grievant continued to refuse to clean out the bottles from under the accumulation table."

Second, the arbitrator found as a fact that Beaupre fully understood the consequences of his failure to comply with his supervisor's directive. After his second refusal of the order, Beaupre accompanied Arsenault to the conference room for a disciplinary meeting. On the way there, Beaupre asked Arsenault whether "he was the man that was going to take the grievant's job over a bottle of water, and if he did, would that make him feel like a man." Based on that statement, the arbitrator concluded that "[c]ertainly, then, the grievant at least by that point understood that he could face termination for failing to comply with Arsenault's directive."

Finally the arbitrator concluded that Beaupre's knowing refusal to comply with the directive was "insubordinate" within the meaning of the Agreement. First, the arbitrator twice used the language "insubordinate behavior" to describe Beaupre's conduct on the night of February 5, 2000. Second, the portion of the award concerning Beaupre's culpability begins with the statement that "[t]here is little doubt in this case that absent some persuasive affirmative defense, the grievant was guilty of the offense of insubordination." The award then proceeded to evaluate and reject the affirmative defenses raised by Beaupre, leaving little doubt that the arbitrator found Beaupre guilty of insubordination.

Upon reaching the conclusion that Beaupre's conduct was insubordinate, the arbitrator was "barred from further inquiry because such additional probing constituted 'ignor[ing] the plain language of the contract.'" Georgia-Pacific Corp. v. Local 27 United Paperworkers Int'l Union, 864 F.2d 940, 945 (1st Cir. 1988) (quoting Misco, Inc., 429 U.S. at 38). This Court has long held that once an arbitrator finds that an employee has committed an act specifically listed in the collective bargaining agreement as providing just cause for termination, the arbitrator is not free to fashion a separate remedy apart from the one provided by the parties' agreement. See Georgia-Pacific, 864 F.2d at 945; S.D. Warren Co. v. United Paperworkers' Int'l Union, 845 F.2d 3, 8 (1st Cir. 1988); Metro Chevrolet, Inc. v. Unión de Tronquistas de Puerto

-13-

Rico, 835 F.2d 3, 5 (1st Cir. 1987). The rationale for this line of cases is simple: contractual provisions like the insubordination clause of Article 32 are bargained for and inserted precisely to take discretion away from arbitrators charged with enforcing the collective bargaining agreement. Cf. Georgia-Pacific Corp, 864 F.2d at 945 ("'[A]n arbitrator does not have unfettered discretion. He may not impose a remedy which directly contradicts the express language of the collective bargaining agreement.'") (quoting Bruno's Inc. v. United Food & Com. Wkrs. Int'l Union, Local 1657, 858 F.2d 1529, 1531 (11th Cir. 1988)). Consequently, the plain language of Articles 32 and 33 left nothing to the arbitrator's discretion except to determine whether or not Beaupre's conduct was insubordinate.

In Georgia-Pacific, this Court held that nearly identical contract language gave the employer the right to discharge, leaving an arbitrator no discretion to fashion a remedy different from the parties' agreed-upon level of discipline. 864 F.2d at 942, 946.[1]

_____

[1] In Georgia-Pacific, the agreement in issue provided that:

> Any employee may be discharged for just cause. Without limiting the generality of the foregoing some of the causes for immediate discharge are:
> . . .
> (5) dishonesty
> . . . Georgia-Pacific, 864 F.2d at 942.

The arbitrator in Georgia-Pacific found that an employee had engaged in an act of dishonesty subjecting him to discipline. However, the arbitrator then overruled the company's decision to

-14-

Evaluating the agreement in Georgia-Pacific, we determined: (1) that the agreement specifying that committing an offense of dishonesty subjected an employee to immediate discharge was unambiguous on its face; (2) that the parties inserted the provision "precisely [to remove] optional choice on the part of the arbitrator;" and (3) that the arbitrator had no discretion to impose another form of discipline once he found dishonesty. Id. at 945-46.

By enumerating offenses that are subject to immediate discharge and distinguishing those offenses from other forms of misconduct that warrant a warning prior to discharge, the parties manifested their intent to remove from the arbitrator's discretion the power to fashion his own remedy for those offenses expressly subjected to automatic discharge. See S.D. Warren Co., 845 F.2d at 7-8 (finding that the purpose of an automatic discharge provision in a collective bargaining agreement reflects the parties' intent to "remov[e] from the arbitrator the authority to determine a remedy once she concludes that a certain rule has been breached"). If the parties intended mitigating circumstances to affect whether

---

terminate the employee, based in part upon the employee's overall employment record. This Court found that the arbitrator had no discretion to impose his own remedy once he found that the employee was guilty of dishonesty. Looking at the agreement, we concluded that "[i]t is difficult to imagine how one could use the English language to state more clearly that dishonesty leads to immediate discharge than is stated in [the agreement]." Id. at 946 (citation and quotation omitted).

-15-

insubordination constitutes just cause for termination, then they would have expressed their intent in the contract. Because we find that the arbitrator determined that Beaupre was guilty of insubordination, his decision to fashion a separate remedy due to mitigating circumstances impermissibly substituted his own notions of industrial justice over those established by the contract. Id.; accord Misco, 484 U.S. at 38.[2]

---

[2] The Union asserts that instead of applying Georgia-Pacific, our analysis ought to be guided by Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8 (1st Cir. 2001) (holding that an arbitrator's decision that conduct did not constitute gross insubordination drew its essence from the contract) and Crafts Precision Industries Inc. v. Lodge No. 1836, 889 F.2d 1184 (1st Cir. 1989) (upholding an arbitrator's determination that some types of insubordination warrant discharge while other less serious instances may warrant only suspension). We disagree. There are two key issues distinguishing this case from the rule of law established in Keebler and Crafts Precision.

First, as we explained in Keebler, Keebler does not apply where, as is the case here, "the arbitrator unambiguously found that the grievant had committed conduct listed in his employment agreement as grounds for termination." Keebler, 247 F.3d at 14 n.2.

Second, the language of the collective bargaining agreements involved in both Keebler and Crafts Precision was substantially more open and ambiguous than the contract language in Georgia-Pacific, Warren and the instant case. As we explained in Crafts Precision, the question of whether an arbitrator exceeded his authority will often turn on whether the agreement delegated open-ended discretion to the arbitrator, or instead, whether the agreement expressly provided that certain types misconduct shall constitute just cause for discharge. Crafts Precision, 889 F.2 at 1185; compare Keebler, 247 F.3d at 12-13 (noting that the agreement expressly required arbitrator to distinguish between gross insubordination, which would be subject to immediate discharge, from less serious instances of insubordination, which would not); and Craft Precision, 889 F.2d at 1185-86 (noting that the agreement vested the employer and arbitrator with the discretion to distinguish conduct that "may result in suspension" from conduct

-16-

Lastly, the Union argues that because the collective bargaining agreement did not define the term insubordination, it was necessary for the arbitrator to devise a definition of insubordination and determine whether the actions of Beaupre were those which constitute insubordination warranting termination under the Agreement. According to this argument, when the arbitrator distinguished between straightforward insubordination and insubordination in the presence of mitigating circumstances, this was precisely the type of interpretive analysis arbitrators are regularly called on to do. Consequently, rather than fashioning a separate remedy at odds with the one provided in the contract, the arbitrator merely clarified the latently ambiguous term insubordination and determined that the conduct involved here was simply too minor to constitute insubordination as that term was intended by the parties.

Were it in fact true that the arbitrator was merely interpreting the term insubordination, this argument might have

_____

that warrants discharge) with Georgia-Pacific, 864 F.2d at 942 (involving a contract which provided that any "employee may be discharged for just cause" and then expressly listed dishonesty as "one of the causes for immediate discharge"). The language in the instant agreement is nearly-identical to that of Georgia-Pacific in that it enumerates misconduct which may warrant discharge without warning. That is, it provides that "just cause for discharge shall include . . . insubordination." (Emphasis added). Unlike Keebler and Crafts-Precision, the instant agreement lacks any language that would authorize an arbitrator to distinguish between degrees of insubordination, or permit an arbitrator to select from a variety of disciplinary remedies.

some merit.  After all, the Union correctly asserts that arbitrators have significant discretion to interpret the terms of a collective bargaining agreement.  It is up to the arbitrator to decide whether a given pattern of conduct constitutes insubordination.  Furthermore, the term insubordination is not defined in the agreement and is obviously susceptible to multiple interpretations.  Thus, the arbitrator here certainly would have been free to decide that Beaupre's conduct was simply too minor to rise to the level of insubordination as that term is used in the contract.

Nevertheless, in this case it cannot be said that the arbitrator's mitigating circumstances analysis was merely part of an interpretation of the term insubordination.  First, the arbitrator never debated the meaning of the term insubordination, and concluded that Beaupre was guilty of "insubordinate behavior" that "extended over a lengthy period of time."  Second, the arbitrator did not begin his mitigating circumstances analysis until after he had established Beaupre's culpability and stated that there was only  "one remaining issue for discussion, that being the level of discipline imposed."  Clearly, the mitigation section of the award only arose when the arbitrator was considering his remedial options, and not when he was supposedly engaged in an interpretation of the term insubordination.

Beaupre's situation is a regrettable one. His supervisor's misconduct undoubtedly temporarily blurred the line separating supervisor and employee, and in so doing, created a scenario in which Beaupre, insulted and hurt by Arsenault's sudden transformation from "one of the guys" to stern company supervisor, felt justified in refusing the order. Nevertheless, Beaupre's defiance outlasted the confusion caused by Arsenault's horseplay. He repeatedly refused a company directive even after that directive had become a formal warning delivered repeatedly by two supervisors. The arbitrator deemed this conduct insubordinate, and, having done so, lacked the contractual authority to mitigate the disciplinary action provided by the collective bargaining agreement. Consequently, the arbitration award is unenforceable and the district court's judgment is affirmed.

**Affirmed**. No costs are imposed.

"**Concurrence follows**"

**BOUDIN, <u>Chief Judge</u> (Concurring)**. Leo Beaupre, then an employee of Poland Spring Corp. at its facility in Maine, refused in February 2000 several direct instructions from two supervisors to pick up some bottles scattered under a table. The company's contract with Beaupre's union provides that "[d]iscipline and discharge shall occur only for just cause. The parties agree that just cause for discharge shall include, but not be limited to, the following: . . . Insubordination . . . ." After a warning, Beaupre was discharged, and the union sought arbitration pursuant to the contract.

In due course, the arbitrator found that Beaupre had clearly violated direct orders from his superiors even after he was advised that this could be a firing offense, and the arbitrator found unsupported several excuses offered for Beaupre's refusals (<u>e.g.</u>, health concerns). However, the arbitrator ruled that under the contract "mitigating considerations" permitted the arbitrator to conclude that termination was too severe a penalty; finding mitigation here -- for example, tasteless jokes by Beaupre's direct supervisor -- the arbitrator ruled that the penalty should be reduced to two weeks' suspension without pay.

Affirming the district court, the panel majority now holds that the arbitrator exceeded his authority in directing Beaupre's reinstatement. It is common ground that the arbitrator is bound by provisions of the contract but also that the arbitrator

-20-

can construe the contract.  See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987).  In effect, the arbitrator takes over the court's role of initial construction; but there remains a vaguely defined limit:  a reviewing court may still conclude that the arbitrator is re-writing the terms instead of construing them.  See id.

Here, the arbitrator could permissibly have read the contract to mean that some acts of disobedience constitute "insubordination" within the meaning of the contract and that other, less severe acts -- although literally disobedience -- do not.  "Insubordination" is not defined in the contract nor is it self-defining and, reading the provision in context, a judge (and even more surely an arbitrator) would be likely to exclude trivial disobedience, such as a refusal to light the supervisor's cigarette.  Consider that lack of cleanliness is also listed as a basis for discharge under this contract, but certainly a smudge on a nose would not qualify for discharge.  So, taking account of the severity of the disobedience is, within broad limits, surely a part of the arbitrator's authority.

Viewed de novo, it is a more difficult question whether the present contract can be read to limit management's right to discharge an insubordinate employee where there exist "mitigating considerations."  Of course, lack of the severity of disobedience could be viewed as a mitigating consideration; but the arbitrator's

-21-

claim in this case is not focused on lack of severity. Rather, he claimed and exercised a broader mandate to take into account anything that might equitably bear on whether a discharge for disobedience seemed fair and proportionate.

Most judges, interpreting this contract for themselves, would probably reject this latter reading. Taking the contract as a whole, it explicitly reserves disciplinary authority to management, save as constrained by other provisions. Most judges would likely take the "just cause" provision quoted above as licensing management to discharge an employee who was patently "insubordinate," even if he had served the company loyally for a decade and had a sick wife at home and a child in college. The contract does not say that discharge for insubordination is permitted only where "just" or "fair."

Even so, the parties in this case empowered an <u>arbitrator</u> to interpret the contract and that includes the power to adopt readings that a judge might reject if no arbitrator were involved. Does this include a reading that allows the arbitrator to say that disobedience is "insubordination" if there are adequate "mitigating considerations" that have nothing to do with whether the disobedience was clear, deliberate, and pertinent to the employee's duties? This is a stretch of language, to be sure, but whether it

goes too far to be a permissible <u>arbitrator</u> reading is something about which reasonable judges might differ.[3]

This debatable issue has been resolved in this circuit. In two different cases, this court has ruled that contracts, similarly structured as that at issue here, give management a right to discharge an employee guilty of a listed offense, and that an arbitrator cannot mitigate the penalty because of ameliorative circumstances. See <u>Georgia-Pacific Corp.</u> v. <u>Local 27, United Paperworkers Int'l Union</u>, 864 F.2d 940 (1st Cir. 1988); <u>S.D. Warren Co.</u> v. <u>United Paperworkers' Int'l Union</u>, 845 F.2d 3 (1st Cir.), <u>cert. denied</u>, 488 U.S. 992 (1988).

In <u>S.D. Warren</u>, 845 F.2d at 6, the contract reserved to management "sole" authority to discipline, subject to appended rules; and the appended rules said that "[v]iolations" of specified rules were "causes for discharge," including "[p]ossession" of marijuana on company property. The discharged employees had possessed marijuana at the plant, but the arbitrator ruled that the sanction was too severe. <u>Id.</u> The <u>Warren</u> decision held that the arbitrator had exceeded his power. <u>Id.</u> at 8.

_____

[3] For example, immediate consideration of "fairness" might push in one direction; in the other, the long-term cost of unpredictability leading in turn to increased difficulty in negotiating even more detailed provisions. Another factor, which might cut either way, might be the practice in the industry. Yet another would be how far the particular equities urged still had some connection with the statutory language.

A similar conclusion was reached in <u>Georgia-Pacific</u>, 864 F.2d at 942-43: the contract permitted discharge for "dishonesty," and the employee had reported himself unable to work for medical reasons and had instead participated in a golf tournament. The arbitrator ordered reinstatement based on the employee's many years of service. <u>Id.</u> at 944. Again, the court held that the arbitrator was improperly rewriting the contract. <u>Id.</u> at 946. Thereafter, this court several times acknowledged that <u>S.D. Warren/Georgia-Pacific</u> were the rule even in cases where the court managed to distinguish those cases on their facts. <u>E.g.</u>, <u>Keebler Co.</u> v. <u>Truck Drivers, Local 170</u>, 247 F.3d 8, 13-14 & n.2 (1st Cir. 2001); <u>Crafts Precision Indus., Inc.</u> v. <u>Lodge No. 1836, Int'l Ass'n of Machinists</u>, 889 F.2d 1184, 1185-86 (1st Cir. 1989).

Based on first principles and Supreme Court precedent, the dissenting opinion in this case argues (in substance) that <u>S.D. Warren</u> and <u>Georgia-Pacific</u> were mistaken. The first principles, themselves derived from Supreme Court precedent, are inevitably quite general statements about the scope of and limits to arbitrator authority; some language helps Beaupre, some helps the company, and none of it in a debatable case like this one would be decisive if we were deciding this case without any governing circuit precedent.

-24-

As for the Supreme Court's holdings, only Misco has facts arguably close to our own.[4] In Misco, 484 U.S. at 41-42, the Court said that an arbitrator could impose a lesser remedy than discharge, arguably in a situation not too far from our own. But the Court's rationale is somewhat cryptic and turned in some measure on a peculiar stipulation of the parties that the issue in dispute was the existence of "just cause," which was said to be open to arbitral determination. Id. Read evenhandedly, Misco is of some help to Beaupre but also could itself be distinguished.

But this panel is not free to resolve this case based on first principles or a reading of Misco favorable to Beaupre. S.D. Warren was decided after Misco -- indeed, on remand after an earlier S.D. Warren decision had been vacated by the Supreme Court for reconsideration in light of Misco. S.D. Warren, 845 F.3d at 4. The decision in S.D. Warren is expressly a determination that neither Misco nor first principles preclude the decision by this court in S.D. Warren -- a decision that pretty clearly embraces our own facts.

---

[4] Other decisions include Eastern Associated Coal Corp. v. United Mine Workers, 531 U.S. 57 (2000), and Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504 (2001). In Eastern, 531 U.S. at 60, 67, the Court affirmed the arbitrator's award because the arbitrator did not find "just cause" for discharge, and the parties, by agreement, entrusted the remedial decision to the arbitrator. In Garvey, 532 U.S. at 510, the Court held that an arbitrator's award could not be set aside because of a court's disagreement with the arbitrator's factual findings.

If our own case were before us as the first one to arise after <u>Misco</u>, its proper disposition would present a difficult and interesting issue.  But the rule that binds successor panels, which serves to make law predictable, is decisive for me.  <u>United States v. Wogan</u>, 938 F.2d 1446, 1449 (1st Cir.), <u>cert. denied</u>, 502 U.S. 969 (1991).

**"<u>Dissent follows</u>"**

**LYNCH**, **Circuit Judge (Dissenting).** The arbitrator interpreted Article 32 of the collective bargaining agreement to say the type of insubordination meant to be encompassed within the "just cause" for termination was insubordination without any mitigating circumstances. The majority says that this interpretation exceeded the arbitrator's scope of authority. I disagree, and so, with respect, I dissent.

I do agree that this case can be distinguished from Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8 (1st Cir. 2001) and Crafts Precision Industries, Inc. v. Lodge No. 1836, International Ass'n of Machinists, 889 F.2d 1184 (1st Cir. 1989), on the grounds given by the majority. I also agree that the district court could reasonably have concluded that it was bound to reverse the arbitrator under Georgia-Pacific Corp. v. Local 27, United Paperworkers International Union, 864 F.2d 940 (1st Cir. 1988), or S.D. Warren Co. v. United Paperworkers' International Union, 845 F.2d 3 (1st Cir.), cert. denied, 488 U.S. 992 (1988). Nonetheless, developments in the law of judicial review of arbitral awards make me doubt that Georgia-Pacific is good law now.

Under that evolving law, I think we are required to affirm the arbitrator's award.[5] The majority relies on language

---

[5]  Alternatively, remand to the arbitrator would be preferable to reversal. "[W]here the basis for an arbitrator's decision is unclear, but the arbitrator's opinion suggests that the decision does not draw its essence from the collective bargaining agreement, remand is appropriate to have the arbitrator clarify the basis for

from United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960), exempting awards that are merely "[the arbitrator's] own brand of industrial justice" from a general policy of judicial deference. This qualification was reiterated in United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 36 (1987). In Misco, however, the Court went on to emphasize language which the majority recites at the outset, but overlooks in its reasoning: "But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Id. at 38. The Misco Court then reversed the court of appeals decision to overturn an arbitral award for misreading the evidence. Id. at 45.

The Supreme Court has continued to mandate judicial deference to arbitral awards in subsequent decisions. In Eastern Associated Coal Corp. v. United Mine Workers, 531 U.S. 57 (2000), the Court again reversed a decision overturning an arbitral award. In Eastern, the arbitrator had ordered reinstatement of an employee who had been fired for failing a random drug test. The arbitrator reasoned that mitigating circumstances -- including a long

_____

his or her decision." Young Radiator Co. v. Int'l Union, UAW, 734 F.2d 321, 326 n.5 (7th Cir. 1984); see also Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Int'l Bhd. of Teamsters, 29 F.3d 742, 747 (1st Cir. 1994)(remand appropriate when arbitrator may have exceeded his authority); Randall v. Lodge No. 1076, Int'l Ass'n of Machinists, 648 F.2d 462, 468 (7th Cir. 1981)(same).

employment history and stress caused by family problems -- outweighed the admitted drug use. Id. at 60, 67. The lower courts had set aside the award on public policy grounds, a reason rejected by the Supreme Court.

Last year, the Court strongly reaffirmed the high standard required for judicial interference in arbitral decisions. In Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504 (2001), the Court overturned the Ninth Circuit's reversal of an arbitral award. The Ninth Circuit had found reversal warranted because the arbitrator "dispensed his own brand of industrial justice," id. at 507, in refusing to consider evidence supporting Garvey's claim. The court of appeals labelled the arbitrator's finding "completely inexplicable" and "border[ing] on the irrational." Garvey v. Roberts, 203 F.3d 580, 590 (9th Cir. 2000). Nonetheless, the Supreme Court responded by reiterating its holdings in Misco and Eastern:

> Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. We recently reiterated that if an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the fact that "a court is convinced he committed serious error does not suffice to overturn his decision."

532 U.S. at 509 (citations omitted). Moreover, the Court went on to conclude that the error alleged -- ignoring important evidence -- did not even rise to the standard of serious error: "The

-29-

arbitrator's analysis may have been unpersuasive to the Court of Appeals, but his decision hardly qualifies as serious error, let alone irrational or inexplicable error. And, as we have said, any such error would not justify the actions taken by the court." Id. at 511 n.2. In short, the court of appeals may not substitute its own contractual interpretation for the arbitrator's, without showing more than "serious error." That is not the case here.

The majority finds that the arbitrator exceeded his authority in interpreting the collective bargaining agreement and in his decision to reinstate Beaupre. But the agreement gives him precisely that authority. The arbitrator's authority is set forth in Article 33, which governs grievance and arbitration. The presentation of a grievance is required to resolve "differences ... as to the meaning or application of the provisions of the Agreement." Any dispute after the third step of the grievance process is submitted to the arbitrator. It is true that Article 33 contains a restriction: "The arbitrator shall have no power to alter or modify any of the terms of this Agreement or to impose on any party a limitation or obligation not explicitly provided for in this Agreement." Even with such a restriction, it is commonplace that an arbitrator has authority to construe the terms of the agreement he is enforcing. See, e.g., Steelworkers, 363 U.S. at 599 ("As we [have] emphasized, the question of interpretation of the collective bargaining agreement is a question for the

arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."). I see nothing in this clause which prohibits the arbitrator from construing the agreement, as he has done here.

The majority also overestimates the restrictions placed on arbitrators' ability to fashion a remedy. The majority holds that "once an arbitrator finds that an employee has committed an act specifically listed in the collective bargaining agreement as providing just cause for termination, the arbitrator is not free to fashion a separate remedy apart from the one provided by the parties' agreement." Opinion at 12-13. The majority takes this to mean that once the arbitrator found insubordination in this case, he had no discretion as to remedy -- he was bound to uphold the employee's termination. But this view overlooks well-established law granting the arbitrator the same level of freedom in crafting a remedy as he has in contractual interpretation. "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." Misco, 484 U.S. at 38. In Misco, it was the use or possession of controlled substances on company property which was listed as cause for

discharge. The arbitrator's authority was limited to interpretation and application of terms in the contract. Nonetheless, the Court upheld the arbitrator's reinstatement of an employee terminated for drug use on company property. Id. at 35. The remedy of reinstatement, under a contractual regime similar to the one at issue here, was within the power of the arbitrator to fashion.

Admittedly, this result -- which I believe to be mandated by Supreme Court precedent -- poses some problems. It is not entirely satisfactory to say to employers that they can draft the collective bargaining agreement to clearly restrict the arbitrator from exercising the authority that the arbitrator applied here. The realities of what happens at the bargaining table may make this illusory. Article 32 was admirably drafted to give management some flexibility and give workers the protection that not every instance of insubordination must mean termination. It can be questioned why the price of that flexibility should be to permit an arbitrator to second guess management's judgment to be less forgiving of an employee's disobedience of a direct order. Here, the employer's unforgiving attitude is not irrational. Beaupre was asked several times, including by a more mature and senior supervisor, to comply with Arsenault's directive. But that is not the question for the court.

Instead, under the law that the Supreme Court has crafted, we must defer to the arbitrator so long as he is "even arguably construing or applying the contract and acting within the scope of his authority." Misco, 484 U.S. at 36. I think we must defer to the award. The majority's decision is thoughtful, well-written, and sensitive. The majority and I simply have a good faith disagreement about the law. To the extent Georgia-Pacific and S.D. Warren are taken to control the outcome of this case, I think it time for this court to disavow both of those cases as inconsistent with Supreme Court precedent. With regret, I find myself in dissent.