**GEORGIA–PACIFIC CORPORATION,**
Plaintiff, Appellant,

v.

**LOCAL 27, UNITED PAPERWORKERS INTERNATIONAL UNION, etc.,**
Defendant, Appellee.

No. 88–1523.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1988.

Decided Dec. 30, 1988.

Rehearing and Rehearing En Banc
Denied Feb. 2, 1989.

Philip J. Moss with whom Perkins, Thompson, Hinckley & Keddy was on brief, for plaintiff, appellant.

Randall E. Nash, with whom, McTeague, Higbee, Libner, Reitman, MacAdam & Case, was on brief, for defendant, appellee.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

The issue presented by this appeal, the scope of an arbitrator's authority to interpret the disciplinary provisions of a collective bargaining agreement, has been a recurring one before this Court. *See S.D. Warren Company v. United Paperworkers' International Union*, 845 F.2d 3 (1st Cir.1988) (*Warren I*), cert. petition pending; *S.D. Warren Company v. United Paperworkers' International Union*, 846 F.2d 827 (1st Cir.1988) (*Warren II*); *Berklee College of Music v. Berklee Chapter of the Massachusetts Federation of Teachers, Local 4412, AFT, AFL–CIO*, 858 F.2d 31 (1st Cir.1988). *See also United Paperworkers Union AFL–CIO v. Misco*, 484

U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

The appellant, Georgia–Pacific Corporation (Employer), challenges a ruling of the district court upholding an arbitrator's award ordering the reinstatement without back pay of employee Robert Cousins (Cousins). Appellee is the United Paperworkers International Union, AFL–CIO (Union), a labor organization which represents the production and maintenance employees of the Employer. The Employer and the Union entered into a labor agreement under which provisions the challenged award was purportedly entered.

Because we consider that the arbitrator exceeded the authority granted to him by the parties to the collective bargaining agreement, we reverse the decision of the district court and remand the case for entry of an order vacating the arbitration award.

### Background facts

In February of 1984 Cousins suffered a work accident as a result of which he lost three fingers in his left hand and suffered nerve damage to that arm. After a period of therapy he was able to return to do light work. Daily exercise was prescribed as well as rest and medication if discomfort to his arm became significant.

Because he was unable to work full time the Company placed Cousins on partial worker's compensation status and paid him for any short-fall in his earnings caused by his work accident. The Company, which is self-insured for worker's compensation purposes, had an "honor system" whereby it allowed Cousins and other workers similarly situated to report absences due to job injury without requiring a doctor's certificate to vouch for the cause of the absence. On several occasions Cousins notified the Company that he would be absent due to his injury, and received worker's compensation from the Company for the hours he would have worked on such instances.

Cousins was scheduled to work on the shift that commenced at 7:00 AM on June 9, 1986, but shortly before that, at 6:00 AM, he called the Company and informed it

that he would not be in because his arm was bothering him too much to allow him to work. He was absent from his scheduled work on that day, and thereafter the Company paid him $60 in worker's compensation benefits for the time he would have worked on that shift.

In fact, after calling the Company to report sick, Cousins had traveled approximately 150 miles from his home, played eighteen holes in four hours in a pro-amateur golf tournament, and traveled back to his home.[1] During the tournament Cousins did not use a motorized golf cart but pulled his golf bag on a handcart over the entire course.

The Company learned of Cousins' extracurricular activities and on June 30, 1986 confronted him in the presence of the shop steward. Cousins admitted that in fact he had played golf on June 9, but claimed it was part of the medical therapy recommended by his doctor. The Company proceeded to discharge him for dishonesty.

### The collective bargaining agreement

A grievance was submitted by the Union pursuant to the collective bargaining agreement then in existence between it and the Company.

Several parts of the agreement are of direct relevance to the issues before us. Section 27 thereof, which describes the grievance procedure, states in paragraph 3 that:

[T]he decision of the Arbitrator shall be final and binding upon all parties to this Agreement. The Arbitrator shall not modify, change or add to the provisions of this Agreement, but shall interpret this Agreement and adjust grievances in accordance with the provisions thereof.

Section 22 contains the specific provisions dealing with employee discipline:

A. Types of Discipline

There shall be considered to be four (4) phases of disciplinary procedures whenever it is necessary to discipline any employee of this Company.

Oral warning
Written warning
Suspension from work without pay
Discharge

. . . . .

B. Causes for Discharge

1. Any employee may be discharged for just cause. Without limiting the generality of the foregoing some of the causes for immediate discharge are:

. . . . .

(5) dishonesty

2. Some of the causes for discharge after proper warning has been given are:

(1) reading of book, newspapers, etc., while on duty

(2) failure to report for duty without good reason

(3) failure to report injuries

(4) habitual tardiness

(5) gambling

(6) smoking anywhere except in authorized areas

3. ... Any employee found under the grievance procedure to have been discharged without just cause shall be reinstated and shall receive pay for time lost.

Because the grievance was not settled in the informal stages of the grievance procedure, the matter was submitted to decision by an arbitrator. The agreed issue submitted for decision was:

Was the grievant properly discharged for dishonesty under § 22, B.1(5) of the labor agreement? If not, what shall be the remedy?

### The arbitrator's award

The factual findings of the arbitrator are substantially those previously discussed hereunder. However, because the arbitrator's specific rulings are directly relevant to our conclusions it is helpful to reproduce a substantial portion of his decision:

The grievant's actions on June 9 were not proper. He knew or should have

1. Different versions were submitted to the arbitrator. The Company alleged that Cousins drove his own car; the Union claimed that

Cousins was driven. The arbitrator did not make a finding on this issue.

known under the honor system that he was only supposed to call-in absent when his arm bothered him to such an extent that he was unable to perform his light duty work. In the present case, two factual findings are possible—but neither of them supports the propriety of the grievant's call-in. Construing the facts more favorably to the grievant, one may conclude that his arm was actually bothering him on June 9, and that his call-in was truthful to that extent. However, judging from his demonstrated ability to play four hours of golf during the time that he was scheduled to work, it seems clear that his arm was not so sore as to prevent him from performing his light duty work—which involved walking, standing and stair-climbing with frequent opportunities for rest, and nothing so strenuous as engaging in more than 90 strokes of a golf club, while walking himself and his clubs a distance of several miles.

Nor are the grievant's actions supported by the therapy plan of his doctors. The September 2, 1986 letter clearly indicates that the grievant should "rest his arm when the discomfort becomes significant." If the discomfort was so significant that he could not work, he certainly should not have been playing golf. Thus, we must assume that his arm was bothering him less than he stated—and less than would have prevented him from working.

. . . . .

. . . [T]he grievant's arm, while bothering him, was not bothering him so much as to prevent him from working.

. . . *[T]he degree of dishonesty involved . . . still constitutes misconduct for which the grievant was properly subject to discipline.* (Emphasis supplied).

The above findings unequivocally establish that Cousins (1) engaged in an act of dishonesty, and (2) was subject to discipline for this act.

As to § 22, B.1(5) the arbitrator went on to state:

*On its face, § 22, B.1(5) does not draw any distinctions between offenses which involve different degrees of dishonesty. Rather, it appears to lump all such offenses together, and it appears to permit the Company to impose immediate discharges in all such cases.* However, that extreme penalty may not be applied to all cases. The Company, may impose less stringent discipline for some of the offenses listed in § 22.B, on its own accord. If so, a reviewing arbitrator may have to determine whether the particular offense is one on which the Company relaxed its right to impose an immediate discharge. (Emphasis supplied).

The above indicates that the arbitrator concluded that § 22, B.1(5) is *unambiguous on its face* in allowing the Company to discharge immediately for dishonesty, although recognizing that this penalty may not be appropriate if the Company, on its own accord, has varied the penalty for such transgression. However, the arbitrator never concluded that the Company had in practice relaxed its right to discharge for dishonesty. He nevertheless ruled that Cousins' discharge was not for "just cause." In reaching this result, the arbitrator reasoned as follows:

In order for a discharge to be sustained as being for just cause it must be shown first, that the misconduct was sufficiently serious to warrant that penalty; and second, that there are no countervailing factors which mitigate that penalty, such as the *circumstances of the offense* or the grievant's overall employment record. A contractual listing of particular offenses which the parties deem serious enough to warrant immediate discharge may deprive the arbitrator of his *normal authority* to mitigate the discharge penalty because of the circumstances of the offense (e.g., where a lesser, rather than a higher degree of dishonesty is shown). However, it does not deprive the arbitrator of his *normal authority* to mitigate the discharge penalty on the basis of the grievant's overall employment record.

In the present case, the circumstances of the grievant's misconduct may be sufficiently serious to meet the minimum

contractual requirements for immediate discharge. Thus, if there were no countervailing factors, the discharge would have to be sustained as being for just cause. Here, however, there is a countervailing factor which is sufficient to tip the balance in the grievant's favor—his overall record of employment. While he is not a 25-year man, he has, after a rocky first year, given the Company nine good years of service. Moreover, he has shown an admirable resiliency and dedication to his work, rehabilitating himself after a serious industrial injury and returning as a productive member of the Company's workforce. The grievant's work record did not give him license to receive workers' compensation under false pretenses. Nevertheless, it was sufficient to require the Company to give him at least one opportunity to correct himself before being subjected to summary discharge. In view of his record, the discharge was not for just cause. Thus the grievant shall be reinstated. However, in light of his misconduct, no back pay need be provided. (Emphasis supplied).

From the above we can gather that the arbitrator concluded that (1) Cousins' dishonesty met the § 22, B.1(5) requirements for immediate discharge, but (2) that the arbitrator had "normal authority" to mitigate the discharge penalty because of Cousins' employment record and (3) thus concluded that his discharge was not for just cause and reinstated him without back pay.

### Discussion

 We start with the proposition that in reviewing the decision of an arbitrator, the courts' role is limited. *Misco, Inc., supra* 108 S.Ct. at 370. We do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of the award. *Id.* We cannot vacate the award because the arbitrator misreads the contract, where there is room to do so, nor are we authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him the authority to decide that question. *Id.* 108 S.Ct. at

371. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.*

 But concluding that our role is limited is not the equivalent to granting limitless power to the arbitrator. Although labor arbitration is the preferred method of settling labor-management disputes and is encouraged by Congressional policy, 29 U.S.C. § 173(d), it is wholly a voluntary decision of private parties, grounded on their will as expressed in the collective bargaining agreement. Thus § 173(d) indicates that this "[f]inal adjustment [is] by a method *agreed upon by the parties*" (emphasis supplied). Therefore, the paramount point to be remembered in labor arbitration is that the power and authority of an arbitrator is totally derived from the collective bargaining agreement and that he violates his obligation to the parties if he substitutes "his own brand of industrial justice" for what has been agreed to by the parties in that contract. *United Steelworkers v. Enterprise Wheel & Car*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). *See also Misco, Inc., supra* 108 S.Ct. at 371. "The arbitrator may not ignore the plain language of the contract...." *Id.* If the language of an agreement is clear and unequivocal, an arbitrator cannot give it a meaning other than that expressed by the agreement. *See* Elkouri and Elkouri, *How Arbitration Works*, 4th Ed., Bureau of National Affairs, Inc., Wash., D.C. (1985), at p. 348.

The Union argues that it is clear from the language of the collective bargaining agreement that the immediate discharge provisions do not supplant the just cause requirement. Thus, even when grounds for immediate discharge are present, the Union contends that the collective bargaining agreement still requires an additional just cause inquiry.

 We disagree. The language of the agreement is unequivocal in that it establishes two *independent* justifications for

dismissal: 1) just cause and 2) a list of offenses, including dishonesty, for which immediate discharge is appropriate. To write a provision creating the effect claimed by the Union would have been an easy task. Simple changes in the contract's language would in fact have created an agreement in which a full just cause analysis was required before any discharge. However, this was not done. The language in this agreement is unambiguous that once dishonesty is established, no further showing is required. In essence, dishonesty, as a ground for immediate discharge, is *per se* just cause.

Moreover, if we accepted the Union's argument, we are unable to see any reason why the list of offenses sanctionable by immediate discharge was included in the language of the agreement. Accepting the Union's argument, this list at best would be a very brief, non-exhaustive list of factors that could, but need not, be considered in a just cause analysis. It would be surprising then that mitigating factors on behalf of the Union also were not included. Therefore, because the Union puts forth no sound argument based on the plain meaning of the language of the agreement or the reasoning of the drafting parties, we find that "just cause" is but one ground for discharge that is to be considered independently of the other enumerated grounds for immediate discharge.

This case represents a patent example of arbitral excess. *See Bruno's, Inc. v. United Food & Com. Wkrs. Intern.*, 858 F.2d 1529, 1531 (11th Cir.1988) ("[A]n arbitrator does not have unfettered discretion. He may not impose a remedy which directly contradicts the express language of the

collective bargaining agreement."). In reaching this conclusion we need go no further than the arbitrator's own conclusions and the limitations on his authority imposed by the specific provisions of the collective bargaining agreement.

■ The factual findings of the arbitrator are not subject to judicial challenge. *See supra* at 944. Accepting them, we find that the arbitrator concluded that: (1) Cousins committed an act of dishonesty which subjected him to discipline, and (2) on its face, § 22, B.1(5) does not draw distinctions in degrees of dishonesty but appears to permit the Company to impose *immediate* discharge in all such cases.

Upon reaching such conclusions, the arbitrator was barred from further inquiry because such additional probing constituted "ignor[ing] the plain language of the contract." *Misco, Inc., supra* 108 S.Ct. at 371.[2] The arbitrator, using reasoning reminiscent of an *Alice in Wonderland* fantasy,[3] held that although he lacked "normal authority" to mitigate the discharge penalty because of the circumstances of the offense, nevertheless concluded that he possessed "normal authority" to mitigate on the basis of Cousins' overall employment record. There is no basis for such "normal authority" in the *source* of the arbitrator's power, the collective bargaining agreement. His action is in fact an abuse of that power. Lacking such a foundation from which to support his conclusion, the arbitrator cannot be said to be "even arguably construing or applying the contract [or] acting within the scope of his authority." *Id.*

---

**2.** We do not mean to suggest that an arbitrator enjoys no discretion in interpreting the terms of a collective bargaining agreement. Although the collective bargaining agreement in this case authorizes immediate discharge for dishonesty, it does not define that term. It is thus up to an arbitrator to decide whether a given pattern of conduct amounts to dishonesty. For example, an arbitrator may decide that stealing a company pencil does not amount to dishonesty for purposes of immediate discharge. In this case, the arbitrator specifically held that Cousins' conduct amounted to dishonesty for purposes of the collective bargaining agreement. That finding terminates the arbitrator's discretion in in-

terpreting the collective bargaining agreement for purposes of this dispute.

**3.** "When I use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."
 "The question is," said Alice, "whether you can make words mean so many different things."
 "The question is," said Humpty Dumpty, "which is to be master—that's all."
L. Carroll, *Through the Looking–Glass and What Alice Found There*, Chapter 6.

In fact we find in *Misco* the full answer to our question. At 108 S.Ct. at 372–73 appears the following:

> The parties stipulated that the issue before the arbitrator was whether there was "just" cause for the discharge, and the arbitrator, in the course of his opinion, cryptically observed that [the Rule] merely listed causes for discharge and *did not expressly provide for immediate discharge.* (Emphasis supplied).

As the arbitrator in this case recognized in his award, § 22, B.1(5) of this collective bargaining agreement provided for immediate discharge, precisely removing optional choice on the part of the arbitrator. To allow the arbitrator to ignore the explicit language of § 22, B.1(5) by substituting "his own brand of industrial justice" for that agreed to by the parties would not only do violence to Section 27 of the Agreement, which prohibits the arbitrator from modifying, changing or adding to the provisions of the contract, but would promote industrial anarchy by encouraging the exercise of *ad hoc* arbitral revision of collective bargaining agreements.[4]

It is difficult for "one to imagine how one could use the English language to state more clearly," that dishonesty leads to *immediate* discharge, than as stated in § 22, B.1(5). *Warren II, supra,* 846 F.2d at 828. This is particularly apparent when § 22, B.1 is compared to § 22, B.2, the latter requiring "proper warning" before discharge. The arbitrator by his *fiat* simply moved "dishonesty" from B.1 to B.2. We cannot condone the tergiversation of such plain and unambiguous language, even by an arbitrator. *See Bruno's Inc. v. United Food & Com. Wkrs. Intern., supra.*

■ Lastly, the Union argues that, even if an employee has violated one of the rules enumerated in the collective bargaining agreement under grounds for immediate discharge, the company's custom, or the "law of the shop," has been such that the company will not immediately discharge the employee, and that arbitrators in the past have not permitted immediate discharge without a full just cause inquiry.

Even if the "law of the shop" would override the contractual provision—an issue on which we offer no opinion—we are unpersuaded that the "law of the shop" has been established sufficiently here. The Union points to a few instances in the record in which an arbitrator had given an employee a lesser sanction than discharge, even though the infraction had been listed as a ground for immediate discharge. Generally, however, "[t]o be binding, a trade custom or usage must be so well known, uniform, long-established, and generally acquiesced in so as to induce the belief that the parties contracted with reference to it, nothing in their contract to the contrary." *Dahly Tool Co. v. Vermont Tap & Die Co.,* 742 F.2d 311, 314 (7th Cir.1984). From the minimal evidence in the record before us, it is difficult to see how this standard has been satisfied with regard to the infraction of dishonesty.

■ Furthermore, the "law of the shop" argument was not the basis of the arbitrator's award. *See ante* at 943. In fact the alleged instances were argued for the first time to the District Court and *not* to the arbitrator. Supplementing the factual record at that level to support the arbitrator's conclusions is as much a violation of *Misco* as adding to it for the purpose of detracting from the award. Thus such evidence is totally unacceptable for our purposes as it was not the basis of the arbitral award.

*Reversed and remanded with instruction to vacate the award.*

---

**4.** Even the remedy entered by the arbitrator runs contrary to the contract, as § 22, B.3 requires the arbitrator, upon a finding of a discharge without just cause, to reinstate the employee *with* pay for the time lost.