TORRUELLA, Circuit Judge.
The appellant, United Food and Commercial Workers International Union *30 AFL-CIO-CLC, Local 1445 (“Union”) appeals from the district court’s summary judgment vacating an arbitration award that reinstated employee Leo Beaupre and reduced his discharge to a suspension without pay. Appellee is the Poland Spring Corporation (“Poland Spring”), which terminated Beaupre for insubordinate behavior on February 5, 2000. We affirm.

Background Facts

Poland Spring is a bottler of non-carbonated water with bottling facilities in Maine. In 2000, Leo Beaupre worked for Poland Spring as a palletizer operator. A palletizer is a machine that loads cases of bottles onto pallets and wraps the full pallets in plastic for shipping. As a palletizer operator, Beaupre was responsible for placing empty pallets on the machine, removing loaded pallets, and keeping the area around his machine clean. Since his palle-tizer was elevated on legs above the floor, this housekeeping task occasionally required him to remove stray bottles from under the machine.
The incident which led to Beaupre’s termination occurred on the night shift beginning on February 5, 2000. Beaupre’s supervisor that night was Mike Arsenault, a former co-worker of Beaupre’s who had recently been promoted to a supervisory role. At some point during the shift, a group of employees got together and began playfully teasing Arsenault. This group included Beaupre. The employees teased Arsenault rather crudely about his recent promotion, stating in starkly graphic terms how he was promoted for providing an imaginative variety of sexual favors to the plant manager, another male.
Arsenault did not appear offended at first. In fact, at some point Arsenault actually joined in the ribbing, pretending to call up the plant manager on his radio to tell the manager that he would be right up to see him. Predictably, this spirit of jocularity did not last. According to Arse-nault, the joking ended when the group received a radio call, and Arsenault assigned the employees to various work tasks. Beaupre, in contrast, testified that Arsenault suddenly “became unglued,” stated “[tjhat will be enough,” and ordered everyone back to work.
When the banter ended, Arsenault directed Beaupre and another worker to go into the filler room and help clean up stray bottles that were on the floor. Beaupre explained to Arsenault that due to an asthmatic condition, he could not work in the filler room where elevated levels of ozone could be present. Arse-nault responded that if Beaupre could not work in the filler room, he should go clean bottles out from underneath the accumulation table. The accumulation table is a large table where filled bottles coming from the filler operation can accumulate if the palletizer operation is interrupted. The task would require Beaupre to crawl under the accumulation table, which stands on legs only a few feet off the floor.
Beaupre refused to follow this directive from Arsenault, telling Arsenault that his “crawling days [were] over; it’s hard for me to crawl into bed [and] hard for me to crawl out of bed.” Arsenault then repeated his directive to Beaupre, but Beaupre continued to refuse to clean out the bottles. According to Arsenault, he then warned Beaupre that his non-compliance would constitute an act of insubordination which could result in Beaupre’s termination. Nevertheless, Beaupre again refused to comply with the order.
Arsenault then directed Beaupre to accompany him to a conference room. On the way there Beaupre asked Arsenault whether he was really going to fire Beaupre over a bottle of water, and also *31 asked Arsenault whether that would make him feel like a man. Despite the fact that Arsenault had now made it clear to Beaupre that he could face termination for failure to comply with Arsenault’s directives, he refused to clean up the bottles.
While they were walking toward the conference room, Arsenault radioed a more experienced supervisor to join them. Also joining them were two other plant employees who came at Arsenault’s request as witnesses. Once again, the supervisors instructed Beaupre to go pick up the bottles as directed, and once again Beaupre refused to perform the assigned work. Beaupre was suspended pending investigation, and sent home.
The following day, the Union filed a grievance, alleging that Arsenault’s fraternizing and joking with the plant employees was unprofessional, and that after being the subject of so much teasing, Arsenault retaliated by trying “to embarrass [Beaupre] in front of his peers by making him crawl under a conveyer for one bottle[.]”
At a post-suspension “Step 2” hearing, Beaupre and the Union offered two affirmative defenses explaining Beaupre’s refusal to obey a directive. The Union’s arguments were rejected, and following the Step 2 grievance meeting, Poland Spring converted Beaupre’s suspension to a termination of employment.

The Collective Bargaining Agreement

The Union submitted a grievance pursuant to the collective bargaining agreement then in existence between it and Poland Spring. Article 32 of the agreement is entitled “Discipline and Discharge” and provides in plain language that insubordination “shall” constitute just cause for termination. That Article also provides that a number of offenses may warrant a lower level of discipline prior to discharge. Insubordination, however, is not such an offense. The relevant section of Article 32 provides:
Discipline and discharge shall only occur for just cause. The parties agree that just cause for discharge shall include, but not be limited to, the following:
8. Insubordination
Under Article 33, the arbitrator’s authority is expressly limited to the provisions of the Agreement. Accordingly “[t]he arbitrator shall have no power to alter or modify any of the terms of this Agreement or to impose on any party a limitation or obligation not explicitly provided for in this Agreement.”

The Arbitrator’s Award

The factual findings of the arbitrator are substantially those previously discussed. Nevertheless, because the primary issue for our consideration is whether the arbitrator unambiguously found that Beaupre’s February 5 conduct was insubordinate, it is helpful here to reproduce substantial portions of the arbitrator’s decision.
His discussion of the termination began:
There is little doubt in this case that absent some persuasive affirmative defense, [Beaupre] was guilty of the offense of insubordination on the February 5, 2000 night shift. Arse-nault repeatedly ordered the grievant to clean out the scrap bottle(s) from under the accumulation table. The grievant repeatedly refused to comply with that directive, even after first Ar-senault and then [another supervisor] made it clear to him that he could be terminated for so refusing.
The arbitrator then evaluated the two affirmative defenses raised by the Union. *32 First, the Union argued that Beaupre’s repeated refusals to follow his supervisor’s order were motivated by a sincerely held concern for his health. The arbitrator determined that this argument was not credible and that Beaupre’s health was not the reason he refused to clean up the bottles. The Union alternatively argued that because the order to clean up the bottles followed so closely upon the sexual banter between Arsenault and the plant workers, Beaupre believed he might have been subjected to undue humiliation or embarrassment, or even risk of sexual assault. The arbitrator determined that this defense was entirely unpersuasive and that any apprehensions Beaupre might have had were not reasonable.
Since the arbitrator began his discussion by stating that “absent some persuasive affirmative defense [Beaupre] was guilty of the offense of insubordination,” one might have expected the arbitrator to conclude his analysis after rejecting both affirmative defenses proffered by the Union. Instead, the arbitrator stated that there was “one remaining issue for discussion, that being the level of discipline imposed.” After thus declaring that he was now exploring remedial possibilities the arbitrator broke down the term “insubordination” into two types: straightforward insubordination, and insubordination in the presence of mitigating circumstances. The arbitrator reasoned:
[Article 32] may well establish that in clear, straight-forward cases of insubordination, without mitigating considerations, the parties by agreement have established the per se rule that there is just cause for termination. However, the language of Article 32 does not state that even in the presence of mitigating circumstances, insubordination still will necessarily provide the company with just cause for termination. On the contrary, where significant mitigating considerations are present, the culpability of the employee may be diminished, and summary termination may no longer be justified. This more complex fact situation must be considered under the general, just cause standard set forth in article 32, giving due weight to the fact that the parties have agreed that a pure case of insubordination, without mitigating considerations, would provide just cause to terminate.
Having distinguished straightforward insubordination from insubordination with mitigating circumstances, the arbitrator placed Beaupre’s claim in the latter category. The arbitrator found that Beaupre’s refusal to comply with his supervisor’s directive was mitigated by his supervisor’s misconduct, which “blurred the line between the supervisor and the workers.” According to the arbitrator, once the supervisor joined in the ribbing and sexual banter, his “improper fraternizing with the workers created an environment where one of the employees might think, at least initially, that Arsenault was not acting in his supervisory capacity, but rather only as one of the guys joking around on the shop floor.” The arbitrator concluded that “it was unjust for the Company to terminate the grievant for his insubordinate behavior which immediately followed.” Nevertheless, despite the presence of mitigating circumstances, the arbitrator concluded that Beaupre’s protracted refusal to comply with the directive still constituted “insubordinate behavior.” The arbitrator determined that:
[Beaupre] should have been able to figure out that Arsenault had shifted gears and was now acting in his supervisory capacity; he should have promptly followed the directives of the person he knew to be his supervisor. Furthermore ... Arsenault first alone and then with the assistance of [another supervi *33 sor] gave the grievant clear warning of the fact that his behavior had become insubordinate, and gave the grievant numerous opportunities over an extended period of time to abandon his initial refusal, and to perform the work as directed.
Ultimately the arbitrator concluded that while mitigating circumstances rendered the company’s decision to terminate Beaupre unjust, Beaupre’s insubordinate behavior over an extended period of time warranted a two week suspension without pay.

Summary Judgment

Poland Spring filed suit in district court to vacate the arbitration award. The court granted summary judgment, finding that the award exceeded the arbitrator’s authority under the Agreement. The court held that in the Agreement there is “nothing about ‘clear, straight-forward’ cases, ‘pure’ cases, or ‘mitigating circumstances.’ ” The court found that under the circumstances, the arbitrator lacked the authority under Article 32 to reinstate an insubordinate employee. The Union appealed.

Discussion

Judicial review of an arbitrator’s decision is extremely narrow and deferential. United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); Keehler Co. v. Truck Drivers, Local 170, 247 F.3d 8, 10 (1st Cir.2001). We do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of an award. Misco, Inc., 484 U.S. at 36-37, 108 S.Ct. 364. We cannot vacate the award because the arbitrator misreads the contract, where there is room to do so. Id. at 37-38, 108 S.Ct. 364. Nor are we authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him the authority to decide that question. Id. at 38., 108 S.Ct. 364 “[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.” Id.
Nevertheless, acknowledging that our role is a limited one is not the equivalent of granting limitless power to the arbitrator. Georgia-Pacific Co. v. Local 27, United Paperworkers Int’l Union, 864 F.2d 940, 944 (1st Cir.1988). The decision to settle labor-management disputes through arbitration is a wholly voluntary decision by private parties, grounded on their will as expressed in the collective bargaining agreement. Id. “Therefore, the paramount point to be remembered in labor arbitration is that the power and authority of an arbitrator is totally derived from the collective bargaining agreement and that he violates his obligation to the parties if he substitutes ‘his own brand of industrial justice’ for what has been agreed to by the parties in that contract.” Id. (quoting United Steelworkers v. Enterprise Wheel & Car, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)); see also Misco Inc., 484 U.S. at 38, 108 S.Ct. 364. If the language of an agreement is clear and unequivocal, an arbitrator cannot give it a meaning other than that expressed by the agreement. Georgia-Pacific Co., 864 F.2d at 944.
In support of the arbitration award, the Union contends that the arbitrator did not unambiguously find Beaupre guilty of insubordination as that term is used in Article 32. Instead, it claims, the arbitrator found that because Beaupre’s actions were mitigated by the horseplay of his supervisor, Beaupre’s conduct should not be treated as insubor *34 dination per se, but should rather be evaluated under the general, “just cause” standard also set forth in Article 32. That is, since Beaupre’s culpability was lessened by his supervisor’s own misconduct, the arbitrator properly considered Beaupre’s misconduct under the flexible “just cause” provision of Article 32, rather than the “insubordination” standard of that same section.
We disagree with the Union’s selective reading of the arbitration award. The award unambiguously concluded that Beaupre’s misconduct on the night of February 5, 2000 constituted insubordination pursuant to Article 32 of the Agreement. The arbitrator unequivocally found: first, that a clear order was repeatedly given to Beaupre; second, that Beaupre fully understood the consequences of failure to comply with the order and yet repeatedly refused to do so; and finally, the arbitrator concluded that Beaupre’s refusals to comply with the order constituted acts of insubordination subject to discipline under Article 32 of the agreement.
First, it is beyond dispute that the arbitrator found that Beaupre repeatedly refused to comply with his supervisor’s directives. He concluded that “the grievant declined to follow this directive from Arse-nault. Arsenault repeated his directive to the grievant, but the grievant continued to refuse to clean out the bottles from under the accumulation table.”
Second, the arbitrator found as a fact that Beaupre fully understood the consequences of his failure to comply with his supervisor’s directive. After his second refusal of the order, Beaupre accompanied Arsenault to the conference room for a disciplinary meeting. On the way there, Beaupre asked Arsenault whether “he was the man that was going to take the griev-ant’s job over a bottle of water, and if he did, would that make him feel like a man.” Based on that statement, the arbitrator concluded that “[c]ertainly, then, the griev-ant at least by that point understood that he could face termination for failing to comply with Arsenault’s directive.”
Finally the arbitrator concluded that Beaupre’s knowing refusal to comply with the directive was “insubordinate” within the meaning of the Agreement. First, the arbitrator twice used the language “insubordinate behavior” to describe Beaupre’s conduct on the night of February 5, 2000. Second, the portion of the award concerning Beaupre’s culpability begins with the statement that “[tjhere is little doubt in this case that absent some persuasive affirmative defense, the grievant was guilty of the offense of insubordination.” The award then proceeded to evaluate and reject the affirmative defenses raised by Beaupre, leaving little doubt that the arbitrator found Beaupre guilty of insubordination.
Upon reaching the conclusion that Beaupre’s conduct was insubordinate, the arbitrator was -“barred from further inquiry because such additional probing constituted ‘ignoring] the plain language of the contract.’ ” Georgia-Pacific Corp. v. Local United Paperworkers Int’l Union, 864 F.2d 940, 945 (1st Cir.1988) (quoting Misco, Inc., 484 U.S. at 38, 108 S.Ct. 364). This Court has long held that once an arbitrator finds that an employee has committed an act specifically listed in the collective bargaining agreement as providing just cause for termination, the arbitrator is not free to fashion a separate remedy apart from the one provided by the parties’ agreement. See Georgia-Pacific, 864 F.2d at 945; S.D. Warren Co. v. United Paperworkers’ Int’l Union, 845 F.2d 3, 8 (1st Cir.1988); Metro Chevrolet, Inc. v. Union de Tronquistas de Puerto Rico, 835 F.2d 3, 5 (1st Cir.1987). The rationale for this line of cases is simple: contractual *35 provisions like the insubordination clause of Article 32 are bargained for and inserted precisely to take discretion away from arbitrators charged with enforcing the collective bargaining agreement. Cf. Georgia-Pacific Corp., 864 F.2d at 945 (“ ‘[A]n arbitrator does not have unfettered discretion. He may not impose a remedy which directly contradicts the express language of the collective bargaining agreement.’ ”) (quoting Bruno’s, Inc. v. United Food & Com. Wkrs. Int’l Union, Local 1657, 858 F.2d 1529, 1531 (11th Cir.1988)). Consequently, the plain language of Articles 32 and 33 left nothing to the arbitrator’s discretion except to determine whether or not Beaupre’s conduct was insubordinate.
In Georgia-Pacific, this Court held that nearly identical contract language gave the employer the right to discharge, leaving an arbitrator no discretion to fashion a remedy different from the parties’ agreed-upon level of discipline. 864 F.2d at 942, 946.[1] Evaluating the agreement in Georgia-Pacific, we determined: (1) that the agreement specifying that committing an offense of dishonesty subjected an employee to immediate discharge was unambiguous on its face; (2) that the parties inserted the provision “precisely [to remove] optional choice on the part of the arbitrator;” and (3) that the arbitrator had no discretion to impose another form of discipline once he found dishonesty. Id. at 945^46.
By enumerating offenses that are subject to immediate discharge and distinguishing those offenses from other forms of misconduct that warrant a warning pri- or to discharge, the parties manifested them intent to remove from the arbitrator’s discretion the power to fashion his own remedy for those offenses expressly subjected to automatic discharge. See S.D. Warren Co., 845 F.2d at 7-8 (finding that the purpose of an automatic discharge provision in a collective bargaining agreement reflects the parties’ intent to “re-mov[e] from the arbitrator the authority to determine a remedy once she concludes that a certain rule has been breached”). If the parties intended ..mitigating circumstances to affect whether insubordination constitutes just cause for termination, then they would have expressed their intent in the contract. Because we find that the arbitrator determined that Beaupre was guilty of insubordination, his decision to fashion a separate remedy due to mitigating circumstances impermissibly substituted his own notions of industrial justice over those established by the contract. Id.; accord Misco, 484 U.S. at 38, 108 S.Ct. 364.[2]
*36 Lastly, the Union argues that because the collective bargaining agreement did not define the term insubordination, it was necessary for the arbitrator to devise a definition of insubordination and determine whether the actions of Beaupre were those which constitute insubordination warranting termination under the Agreement. According to this argument, when the arbitrator distinguished between straightforward insubordination and insubordination in the presence of mitigating circumstances, this was precisely the type of interpretive analysis arbitrators are regularly called on to do. Consequently, rather than fashioning a separate remedy at odds with the one provided in the contract, the arbitrator merely clarified the latently ambiguous term insubordination and determined that the conduct involved here was simply too minor to constitute insubordination as that term was intended by the parties.
Were it in fact true that the arbitrator was merely interpreting the term insubordination, this argument might have some merit. After all, the Union correctly asserts that arbitrators have significant discretion to interpret the terms of a collective bargaining agreement. It is up to the arbitrator to decide whether a given pattern of conduct constitutes insubordination. Furthermore, the term insubordination is not defined in the agreement and is obviously susceptible to multiple interpretations. Thus, the arbitrator here certainly would have been free to decide that Beaupre’s conduct was simply too minor to rise to the level of insubordination as that term is used in the contract.
Nevertheless, in this case it cannot be said that the arbitrator’s mitigating circumstances analysis was merely part of an interpretation of the term insubordination. First, the arbitrator never debated the meaning of the term insubordination, and concluded that Beaupre was guilty of “in *37 subordinate behavior” that “extended over a lengthy period of time.” Second, the arbitrator did not begin his mitigating circumstances analysis until after he had established Beaupre’s culpability and stated that there was only “one remaining issue for discussion, that being the level of discipline imposed.” Clearly, the mitigation section of the award only arose when the arbitrator was considering his remedial options, and not when he was supposedly engaged in an interpretation of the term insubordination.
Beaupre’s situation is a regrettable one. His supervisor’s misconduct undoubtedly temporarily blurred the line separating supervisor and employee, and in so doing, created a scenario in which Beaupre, insulted and hurt by Arsenault’s sudden transformation from “one of the guys” to stern company supervisor, felt justified in refusing the order. Nevertheless, Beaupre’s defiance outlasted the confusion caused by Arsenault’s horseplay. He repeatedly refused a company directive even after that directive had become a formal warning delivered repeatedly by two supervisors. The arbitrator deemed this conduct insubordinate, and, having done so, lacked the contractual authority to mitigate the disciplinary action provided by the collective bargaining agreement. Consequently, the arbitration award is unenforceable and the district court’s judgment is affirmed.
Affirmed. No costs are imposed.

. In Georgia-Pacific, the agreement in issue provided that:
Any employee may be discharged for just cause. Without limiting the generality of the foregoing some of the causes for immediate discharge are:
(5) dishonesty
.. . Georgia-Pacific, 864 F.2d at 942.
The arbitrator in Georgia-Pacific found that an employee had engaged in an act of dishonesty subjecting him to discipline. However, the arbitrator then overruled the company's decision to terminate the employee, based in part upon the employee’s overall employment record. This Court found that the arbitrator had no discretion to impose his own remedy once he found that the employee was guilty of dishonesty. Looking at the agreement, we concluded that "[i]t is difficult to imagine how one could use the English language to state more clearly that dishonesty leads to immediate discharge than is stated in [the agreement].” Id. at 946 (citation and quotation omitted).

. The Union asserts that instead of applying Georgia-Pacific, our analysis ought to be guided by Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8 (1st Cir.2001) (holding that an arbitrator's decision that conduct did not constitute gross insubordination drew its essence from the contract) and Crafts Precision Industries Inc. v. Lodge No. 1836, 889 F.2d 1184 (1st Cir.1989) (upholding an arbitrator's de *36 termination that some types of insubordination warrant discharge while other less serious instances may warrant only suspension). We disagree. There are two key issues distinguishing this case from the rule of law established in Keebler and Crafts Precision.
First, as we explained in Keebler, Keebler does not apply where, as is the case here, "the arbitrator unambiguously found that the grievant had committed conduct listed in his employment agreement as grounds for termination." Keebler, 247 F.3d at 14 n. 2.
Second, the language of the collective bargaining agreements involved in both Keebler and Crafts Precision was substantially more open and ambiguous than the contract language in Georgia-Pacific, Warren and the instant case. As we explained in Crafts Precision, the question of whether an arbitrator exceeded his authority will often turn on whether the agreement delegated open-ended discretion to the arbitrator, or instead, whether the agreement expressly provided that certain types misconduct shall constitute just cause for discharge. Crafts Precision, 889 F.2d at 1185; compare Keebler, 247 F.3d at 12-13 (noting that the agreement expressly required arbitrator to distinguish between gross insubordination, which would be subject to immediate discharge, from less serious instances of insubordination, which would not); and Crafts Precision, 889 F.2d at 1185-86 (noting that the agreement vested the employer and arbitrator with the discretion to distinguish conduct that "may result in suspension” from conduct that warrants discharge) with Georgia-Pacific, 864 F.2d at 942 (involving a contract which provided that any "employee may be discharged for just cause” and then expressly listed dishonesty as "one of the causes for immediate discharge”). The language in the instant agreement is nearly-identical to that of Georgia-Pacific in that it enumerates misconduct which may warrant discharge without warning. That is, it provides that "just cause for discharge shall include ... insubordination.” (Emphasis added). Unlike Keebler and Crafts-Precision, the instant agreement lacks any language that would authorize an arbitrator to distinguish between degrees of insubordination, or permit an arbitrator to select from a variety of disciplinary remedies.