# United States Court of Appeals
## For the First Circuit

No. 18-2263

STEWARD HOLY FAMILY HOSPITAL, INC.,

Plaintiff, Appellee,

v.

MASSACHUSETTS NURSES ASSOCIATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

James F. Lamond, with whom Allison J. Zimmon and McDonald Lamond Canzoneri were on brief, for appellant.
Joshua D. Nadreau, with whom Joseph W. Ambash and Fisher & Phillips, LLP were on brief, for appellee.

August 1, 2019

**KAYATTA**, **Circuit Judge**.  After Maureen Bean grabbed the face of a colleague at work, the Steward Holy Family Hospital ("the Hospital") terminated her employment as a nurse in the medical-surgical unit.  Bean's union, the Massachusetts Nurses Association ("the Union"), then initiated grievance procedures against the Hospital, arguing that there was not just cause for her termination under the parties' collective bargaining agreement (CBA).  The parties submitted the dispute to an arbitrator.  After establishing that Bean had engaged in misconduct providing just cause for discipline, the arbitrator concluded that Bean's termination was nevertheless unwarranted and ordered that she be reinstated with backpay.  The Hospital initiated this action to vacate the arbitrator's award, asserting that the arbitrator exceeded his authority under the parties' CBA.  The U.S. District Court for the District of Massachusetts agreed and entered summary judgment for the Hospital.  We now reverse.

**I.**

Both parties accept the general proposition that "an arbitrator's factual findings are not open to judicial challenge." El Dorado Tech. Servs., Inc. v. Union Gen. de Trabajadores, 961 F.2d 317, 320 (1st Cir. 1992).  So, we summarize the facts as they are presented in the arbitrator's opinion.

This case arose out of confusion surrounding the granting of vacation requests by nurses within the medical-

surgical unit of the Hospital. Chris Ouellet, the supervising nurse in that unit, maintained a policy of resolving competing vacation requests based on seniority. In January 2016, Ouellet received vacation requests for the first week of March from Bean, two more senior nurses, and a junior nurse, Nancy Waterhouse. Ouellet denied Bean's request but instead offered her the second week in March, which Bean accepted. Upon inspecting the vacation calendar in the nurses' break room, Bean discerned that Waterhouse -- who had submitted an earlier request and had already paid a deposit on a vacation rental -- had received approval from Ouellet to take off the first week in March.

Not pleased with this turn of events, Bean called Waterhouse's home numerous times, leaving multiple voicemails and requesting that Waterhouse return her calls before the two briefly "discuss[ed] the vacation situation without rancor." The following weekend, Bean called and left messages for Waterhouse on Friday, Saturday, and Sunday to inform her of an upcoming union meeting that had been calendared to discuss problems related to scheduling vacations. Waterhouse did not return Bean's calls. Then, while Waterhouse and Bean were both clocking into work the following Tuesday, Bean confronted Waterhouse about her unreturned calls, squeezed Waterhouse's cheek, and, "talking like a baby, asked if everything worked out with her vacation." Waterhouse angrily told Bean to "worry about [her] own vacation." Later that

day, Bean came up behind Waterhouse, ran a finger along her back, and said, "I didn't mean to upset you back there.  We need to do something about this vacation policy."  Waterhouse responded that she agreed that something needed to be done about the vacation policy but that she did not appreciate the phone calls or Bean's grabbing her by the face.

Ten days later, Waterhouse reported the incident to the Hospital's Human Resources Department.  This was not the first time that Bean's coworkers had reported her for misconduct.  Four years earlier, Ouellet counseled Bean after she "angrily pulled the ponytail of a colleague."  Ouellet again counseled Bean after she reportedly "demeaned a student nurse and offended [the resident nurse]."  And just one week before the altercation with Waterhouse, Ouellet gave Bean a verbal warning for "profanely defying [Ouellet's] directive."  Following an investigation into Waterhouse's allegations, the Hospital terminated Bean.  It based the termination solely on its conclusion that Bean had indeed grabbed Waterhouse by the face -- an act that the Hospital deemed an "assault."  The Union then initiated grievance proceedings against the Hospital on Bean's behalf, arguing that Bean was not guilty of misconduct and, alternatively, that termination was a disproportionate response to Bean's alleged wrongdoing.

The CBA provides for the use of arbitration to resolve formal grievances related to the Hospital's "interpretation,

- 4 -

application, or enforcement" of the CBA.  Significantly, however, the arbitrator's authority to resolve grievances arising under the CBA is not plenary under the terms of the CBA.  The text of the CBA as it bears on the scope of that authority is as follows:

- Article V, Management Rights

  - Section 1:  "Except to the extent expressly limited by this Agreement, the Hospital retains the exclusive right . . . to discipline and discharge Employees for just cause . . . [and] to issue, amend and enforce reasonable work rules and policies not inconsistent with the provisions of this Agreement."

- Article X, Grievance and Arbitration

  - Section 5:  "The Arbitrator's authority shall be limited to the interpretation and application of the parties' Agreement.  No arbitrator shall have the authority to add to, subtract from, or modify the Agreement in any respect, or to substitute his/her discretion or judgment for that of the Hospital."

- Article XXXIII, Discipline and Discharge

  - Section 1:  "A Nurse who has completed his/her probationary period and has acquired seniority under this Agreement shall not be suspended, discharged, demoted or otherwise disciplined except for just cause. Discipline may include, but is not limited to,

counseling, verbal warnings, written warnings, suspension and/or termination. The Hospital may utilize whatever level of discipline it believes is appropriate depending on the circumstances, but it will make reasonable efforts to utilize progressive discipline."

- Appendix G

  o "All existent policies applicable to bargaining unit employees are hereby included in this CBA by reference, except to the extent that the express terms of this collective bargaining agreement supersede any contradictory provision of an existing policy."

The parties submitted the following issues to the arbitrator for resolution:  "Was the termination of Maureen Bean for just cause? . . . If not, what shall be the remedy?" Rejecting Bean's denial that she had grabbed Waterhouse, the arbitrator concluded that Bean had engaged in an inappropriate, unconsented touching "for which there was just cause to impose discipline." Nevertheless, he then found that Bean's conduct did not warrant "termination in the first instance, without progressive discipline." Accordingly, the arbitrator directed the Hospital to reduce its penalty to a written warning and to reinstate Bean with backpay.

The Hospital filed suit, arguing that the arbitrator exceeded the scope of his authority under the CBA in vacating the

Hospital's decision to terminate Bean and in ordering her reinstatement. The district court entered summary judgment for the Hospital, see Steward Holy Family Hosp., Inc. v. Mass. Nurses Ass'n, 350 F. Supp. 3d 7, 16 (D. Mass. 2018), and this appeal followed.

## II.

"In order to assess whether the arbitrator exceeded his contractual authority to resolve the parties' dispute, we look first at the specific provisions of the CBA and the agreement to arbitrate it contains." Butler Mfg. Co. v. United Steelworkers, 336 F.3d 629, 633 (7th Cir. 2003). Additionally, "an arbitrator's authority under the CBA may be supplemented by the parties' submissions." Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica de P.R. Local 610, 959 F.2d 2, 4 (1st Cir. 1992); see also Butler Mfg. Co., 336 F.3d at 633 ("[W]e may also consult the parties' submissions . . . to see if there was a post-dispute agreement to submit additional questions to the arbitrator.").

We have labelled the degree of deference that we afford an arbitrator's interpretation of the governing arbitration agreement as "extreme." Salem Hosp. v. Mass. Nurses Ass'n, 449 F.3d 234, 237 (1st Cir. 2006). "If an arbitration award rests on a plausible interpretation of the underlying contract, we must uphold it." Id.; see also United Paperworkers Int'l Union v.

- 7 -

Misco, Inc., 484 U.S. 29, 38 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). That said, "[t]he arbitrator cannot . . . ignore the contract and simply dispense 'his own brand of industrial justice.'" Kraft Foods, Inc. v. Office & Prof'l Emps. Int'l Union, Local 1295, 203 F.3d 98, 100 (1st Cir. 2000) (quoting United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960)).

The Hospital suggests that the Supreme Court's command that we uphold an arbitrator's decision so long as "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," Misco, Inc., 484 U.S. at 38, denotes a disjunctive test whereby a reviewing court only reaches the "arguably construing or applying" (i.e., "plausibility") inquiry after first determining that the arbitrator acted within the scope of his authority. In this proffered, disjunctive formulation of our standard of review, the Hospital appears to conflate the standard by which we review questions of arbitrability with that which we use to address the question presented in this case -- that is, whether the arbitrator acted within the scope of the authority granted to him under the parties' agreement. Compare Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 7 (1st

- 8 -

Cir. 2014) ("'Unless the parties clearly and unmistakably provide otherwise,' the court must resolve a disagreement among the parties as to whether an arbitration clause applies to a particular dispute." (citation omitted) (quoting AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986))), with Salem Hosp., 449 F.3d at 238 (observing that in reviewing an arbitrator's interpretation of her own authority under the parties' agreement, we ask "whether the arbitrator had a plausible basis for her determination"). While we acknowledge that it might sometimes be difficult to determine whether a challenge to an arbitration award poses a question of arbitrability or a question of whether the arbitrator acted within the scope of his delegated authority, see Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 n.2 (2013) (noting that the plaintiff might have alternatively challenged the arbitration award on the basis of arbitrability), the Hospital itself frames the question at hand as a challenge to the manner in which the arbitrator elected to resolve the admittedly arbitrable dispute as exceeding the scope of his authority under the terms of the CBA. This question is governed by our normal, deferential plausibility standard. See, e.g., id. at 568-69; N. New England Tel. Operations LLC v. Local 2327, Int'l Bhd. of Elec. Workers, 735 F.3d 15, 21 (1st Cir. 2013); Salem Hosp., 449 F.3d at 238; Poland Spring Corp. v. United Food & Commercial Workers Int'l

- 9 -

Union, Local 1445, 314 F.3d 29, 33 (1st Cir. 2002); Dorado Beach Hotel Corp., 959 F.2d at 4-5.

In finding that the CBA invites no plausible interpretation that would have allowed the arbitrator to reject the Hospital's chosen penalty of termination, the district court -- like the Hospital -- relied on two basic arguments. First, it pointed to the fact that the CBA incorporated a policy that deemed threatening or intimidating conduct to be just cause for termination. Second, it relied on the CBA's reservation to the Hospital of certain rights in connection with employee discipline. We consider each argument in turn.

**A.**

Appendix G of the CBA incorporates into the parties' agreement "[a]ll existent policies applicable to bargaining unit employees." The district court first looked to one such policy, the "Disciplinary Action Policy," which categorizes employee infractions within three groups and provides appropriate disciplinary responses based on the severity of the offense and the employee's history of misconduct. Group III includes the most serious employee infractions, such as reporting to work under the influence of alcohol, possessing weapons on hospital property without permission, and theft, and it also includes the less pellucid offense of "[t]hreatening, intimidating, or coercing fellow employees on the premises at any time for any purpose."

- 10 -

This latter offense, in turn, refers to the Hospital's "Zero Tolerance for Disrespect" policy, which provides that the Hospital "will not tolerate verbal, written or physical conduct by anyone who works or practices at [the Hospital]" that "[c]reates an intimidating, offensive or hostile environment" or "[d]isrupts the operation of the [H]ospital or individuals working therein." While Group I[1] and Group II[2] offenses provide for a scheme of progressive discipline -- beginning with a verbal or written warning, including a final written warning, and ending with termination -- the only recommended penalty for a Group III offense is "immediate termination."

The district court then observed that once the arbitrator concluded that Bean's conduct "constituted a 'civil battery'" -- a finding the court deemed "consistent with the Hospital's determination that Bean had engaged in a Group III offense for which immediate termination was justified" -- the arbitrator's "role was fulfilled" and he was not at liberty to

---

[1] Group I includes infractions such as "[a]bsenteeism," "[l]oitering during work hours," and "[o]ther minor inappropriate behavior." The policy provides for a verbal warning, a written warning, a final written warning, and termination for a first, second, third, and fourth Group I offense, respectively.

[2] Group II includes offenses such as "[o]bscene or inappropriate language," "[s]ubstantial interference with work of other employees," and "[o]ther inappropriate behavior." The policy provides for a written warning, a final written warning, and termination for a first, second, and third Group II offense, respectively.

prescribe a lesser form of discipline.  Steward Holy Family Hospital, Inc., 350 F. Supp. 3d at 14-15.  The Hospital parrots this reasoning on appeal.

We cannot accept this logic because we do not read the arbitrator's decision as concluding that Bean's offense was a Group III offense.  The decision does not expressly assign Bean's offense to any single Group.  Nevertheless, the arbitrator did expressly find that Bean's act "was not so serious that it justified termination in the first instance" and that it called for progressive discipline, including a written warning and a final warning, prior to termination.  Only Groups I and II call for proceeding in this manner.

The Hospital contends that the classification of Bean's infraction as a Group III offense is nevertheless "inescapable," constituting an "intentional tort" of just the sort referred to in the Hospital's "Zero Tolerance for Disrespect" policy.  In other words, the Hospital would have us deem implausible any reading of this policy that would classify Bean's offense as a non-Group III offense.  We cannot agree.  The Hospital's Disciplinary Action Policy by its terms provides "guidelines" and "examples" that would warrant a recommended penalty of immediate termination.  And some of the descriptions of qualifying conduct listed in the Disciplinary Action Policy are quite vague, leaving the arbitrator significant discretion to interpret their meaning and determine

whether they encompass Bean's infraction. See, e.g., Poland Spring Corp., 314 F.3d at 36 ("[A]rbitrators have significant discretion to interpret the terms of a collective bargaining agreement."); id. at 37 (Boudin, J., concurring) ("Here, the arbitrator could permissibly have read the contract to mean that some acts of disobedience constitute 'insubordination' within the meaning of the contract and that other, less severe acts -- although literally disobedience -- do not."); Ga.-Pac. Corp. v. Local 27, United Paperworkers Int'l Union, 864 F.2d 940, 945 n.2 (1st Cir. 1988) ("Although the collective bargaining agreement in this case authorizes immediate discharge for dishonesty, it does not define that term. It is thus up to an arbitrator to decide whether a given pattern of conduct amounts to dishonesty.").

The Hospital argues that Bean's conduct necessarily falls under the Group III offense of "[t]hreatening" or "intimidating" a "fellow employee[] on the premises at any time for any purpose." But the arbitrator found that while "Ms. Waterhouse understandably felt mildly bullied and upset by the[ir] interaction," nothing in the record indicated that "[Bean] intended harm or that Ms. Waterhouse was placed in fear." Indeed, Monica Messina, the only third-party witness to the incident, described the cheek squeeze as a "friendly gesture." And in light of the quite serious offenses listed in Group III -- such as the "[u]nauthorized possession of weapons on hospital property,"

"[t]heft," and "[r]eporting to work under the influence of alcohol or any other substance" -- an arbitrator could have plausibly interpreted Bean's conduct as not amounting to the same level of seriousness as the other offenses listed in that category.  For similar reasons, nothing in the record compels the conclusion that Bean's conduct "[c]reate[d] an intimidating, offensive or hostile environment" or "[d]isrupt[ed] the operation of the [H]ospital or individuals working therein"  so as to trigger the Hospital's Zero Tolerance Policy.  In short, even assuming that the arbitrator could not overrule a decision by the Hospital to terminate an employee for committing a Group III offense, nothing in the CBA or the incorporated policies inarguably required that the arbitrator classify Bean's conduct as a Group III offense.  Hence, the Hospital's argument that the arbitrator exceeded his authority by misapplying the CBA and rejecting its recommended penalty of termination for a Group III offense fails.

**B.**

More ambitiously, the Hospital argues that the CBA generally insulated the Hospital's choice of discipline from arbitral review once the arbitrator concluded that just cause existed for discipline of some type, Group III or not.  In its view, "[h]aving concluded that [Bean] was guilty of the misconduct for which she had been terminated, the arbitrator lacked the authority to modify the discipline."  In support of this reading,

the Hospital points to Article X, section 5 and Article XXXIII, section 1 of the CBA (both set forth above).

We find the foregoing provisions too ambiguous to shackle the arbitrator in this way. The Hospital certainly retained the exclusive right to discipline and discharge even tenured, non-probationary nurses, but it could only do so for "just cause." Similarly, while the CBA states that the "Hospital may utilize whatever level of discipline it believes is appropriate," the Hospital acknowledges on appeal that the CBA expressly conditions this right on the Hospital making "reasonable efforts to utilize progressive discipline." The Hospital's reliance on the provision that prohibited the arbitrator from "substitut[ing]" his discretion for that of the hospital fails for the same reason. The Hospital's discretion was already limited by just cause and its promise to make "reasonable efforts to utilize progressive discipline." In the words of the Hospital's brief: "In Article XXXIII of the CBA, the parties agreed that the Hospital has the right to 'utilize whatever level of discipline it believes is appropriate depending on the circumstances,' provided that it makes reasonable efforts to use progressive discipline" (emphasis added). And, as we have already explained, Appendix G to the CBA incorporates the Disciplinary Action Policy, which identifies progressive forms of discipline in a manner that omits discharge as an option in many situations, plausibly including the situation

presented here. One must strain too hard to find no plausible construction of this language that would allow an arbitrator to conclude that the Hospital impermissibly forewent the use of progressive discipline in this case.

The CBA itself provides further support for the conclusion that the Hospital's reserved right to discipline workplace misconduct is conditioned on notions of just cause and its use of progressive discipline, the reasonableness of which is subject to arbitral review. Article XI, section 5 addresses one particular type of employee misconduct not at issue here: violations of the contract's "no strike" provisions. The language in that section plainly says what the Hospital would have us read the more general discipline and discharge provisions as saying for all misconduct: "[A]n arbitrator may consider only whether the employee engaged in conduct which violates the provisions of this Article . . . [and] shall not have the authority to modify the degree of discipline imposed."[3] The fact that the same CBA eschews

---

[3] Article XI, section 5 reads in its entirety: "Any Nurse who engages in any conduct which violates the provisions of this Article shall be subject to discipline up to and including immediate discharge. In an arbitration concerning the discipline or discharge of an employee for violating the provisions of this Article, an arbitrator may consider only whether the employee engaged in conduct which violates the provisions of this Article. If the Arbitrator concludes that the employee engaged in any conduct which violates the provisions of this Article, such violation shall constitute just cause, and the grievance shall be denied. The Arbitrator shall not have the authority to modify the degree of discipline imposed."

such simple and plain language regarding discipline for other conduct (such as Bean's) supports the arbitrator's assumption that his authority was not so limited.

The Hospital also seeks haven in three prior cases in which we have stricken arbitral awards. See Poland Spring Corp., 314 F.3d at 31, 34-35 ("[O]nce an arbitrator finds that an employee has committed an act specifically listed in the collective bargaining agreement as providing just cause for termination, the arbitrator is not free to fashion a separate remedy apart from the one provided by the parties' agreement."); Ga.-Pac. Corp., 864 F.2d at 945-46 (concluding that once the arbitrator found that the employee had committed an act of dishonesty for which the agreement imposed immediate discharge as a sanction, "the arbitrator was barred from further inquiry"); S.D. Warren Co. v. United Paperworkers' Int'l Union, AFL-CIO, Local 1069, 845 F.2d 3, 7-8 (1st Cir. 1988) (finding that the arbitrator was not even arguably construing or applying the agreement when "the contract plainly state[d] that the company ha[d] the sole right to discharge employees for the violation which admittedly occurred," but the arbitrator nevertheless ordered a reduced penalty). We disagree with the Hospital that this case is analogous to these earlier precedents. Here, the CBA did not inarguably grant the employer the right to terminate a tenured, non-probationary nurse for the type of conduct at issue without first following the parties'

agreement that the Hospital would make reasonable efforts to use progressive discipline.

Because we find that the arbitrator did not exceed the scope of his authority under the CBA in determining that Bean's conduct did not fall within a Group III offense and ordering a lesser form of discipline in accordance with the CBA and the Hospital's own disciplinary policies, we need not address the Union's alternative argument that the parties' submissions expanded the scope of the arbitrators' authority to order a less severe form of discipline. Nor does the Hospital present us with any argument that the arbitrator selected the wrong level of discipline in view of Bean's prior infractions.

## III.

For the foregoing reasons, we reverse the district court's entry of summary judgment for the Hospital, and we remand for proceedings consistent with this opinion.